**CELATRON, INC., a Corporation, by and through Mark B. Andrews, Irving B. Kugler, and Donald S. Hilleary, Trustees, Plaintiffs-Appellants,**

v.

**CAVIC ENGINEERING COMPANY, a Corporation, Defendant-Respondent.**

No. 32962.

St. Louis Court of Appeals.

Missouri.

Sept. 17, 1968.

Motion for Rehearing, or to Modify or to Transfer to Supreme Court Denied Oct. 23, 1968.

Donald S. Hilleary, Clayton, for plaintiffs-appellants.

Murphy, Roche & Schlapprizzi, St. Louis, for defendant-respondent.

WOLFE, Judge.

This is an action brought originally by Celatron, Inc. The plaintiff corporation was dissolved during the pendency of the action and the statutory trustees for it were substituted as parties plaintiff. They sought by this action to recover $9,055.67 allegedly owing to Celatron by the Cavic Engineering Company. The defendant set up two defenses: the first was a release of any obligation owing to Celatron, Inc., and the second was a set-off of a sum alleged to be owing to Cavic by Celatron. There was a verdict and judgment for the defendant and the plaintiff prosecutes this appeal.

For the sake of clarity we will refer to Celatron, Inc. as the plaintiff and appel-

lant. The plaintiff's case in chief consisted of admissions made by the vice-president of defendant Cavic Engineering Company in answer to interrogatories which stated that the books of the Cavic Engineering Company showed that three sums—$974.95, $1,080.72 and $7,000.00—were recorded as payables. The $7,000.00 item was recorded in the Receipts Journal with the word "loan" next to the account number. With that showing the plaintiff rested its case.

The defendant's evidence disclosed that plaintiff Celatron, Inc., was engaged in developing a device called a cell which contained chemicals and was designed to release ions when placed in the fuel tank of an automobile. The action of the ions so released was to cut down air-contaminating exhaust fumes. The defendant Cavic Engineering Company had been employed in March of 1961 by plaintiff Celatron, Inc. to assist them in this work. Jack Adams who was in charge of the Celatron operation asked Mr. Rogers, president of the Cavic Engineering Company, to take a trip with him to California. Celatron paid Rogers' expenses and it was agreed that Cavic was to be paid $20.00 an hour for engineering services. From that time on to November, 1961, Cavic did make designs, models, produced cells and expended engineering time in the value of $8,685.00 for which Celatron had not paid.

On December 5, 1961, Celatron, Inc. agreed with the stockholders of Cavic Engineering Company that it would take over all of the stock of Cavic Engineering Company in exchange for stock in Celatron, Inc. Thereafter Celatron took over the books of Cavic Engineering and treated it as a wholly owned subsidiary. Shortly prior to the actual signing of the contract to purchase, Celatron moved its operation into the property of Cavic Engineering. Celatron stock was issued to the Cavic stockholders and their stock was turned over to Celatron. Real estate owned by Cavic was also deeded to Celatron.

A witness who had been the general manager of Celatron, Inc. at the time of the purchase by Celatron of the Cavic stock, testified that after they took over the books of Cavic, Celatron's bookkeeper made the entries in Cavic's books. The sum of $974.95, the first of the three sums for which the plaintiff sued, was paid to Cavic by Celatron on October 24, 1961. After Celatron took over the books and on December 27, 1961, a check for that amount was drawn on Cavic's bank account payable to Celatron, Inc. The second sum mentioned, $1,080.72, was paid to Cavic December 15, 1961, and paid back by check the same day. Upon this evidence being introduced the plaintiff reduced its claim to $7,000.00.

By early January, 1962, both Celatron, Inc. stockholders and the Cavic Engineering Company group were not pleased with the way things had been going after Celatron acquired Cavic. According to the then manager of Celatron it was agreed that "both companies would go back to the position that they were in previously, one without obligation to the other." On March 20, 1962, the parties entered into an agreement which was drafted by the attorney for Celatron, Inc. It was as follows:

"WHEREAS, David K. Murphy, Arthur B. Twersky, Kenney Products Co., Inc., a Missouri corporation, John I. Murphy, Jr., Gerald L. Rogers, Robert Franke, Howard Soman, Cavic Engineering Co. and Celatron, Inc. entered into contracts for the acquisition by Celatron of the capital stock of Cavic Engineering Co., and the owners of certain real property occupied by Cavic Engineering Co. agreed to sell the same to Celatron, Inc., under which contracts Celatron, Inc. was to acquire all of the capital stock of Cavic Engineering Co. and said real estate subject to certain liens, and the owners of said stock and real estate were to receive stock of Celatron, Inc.,

"WHEREAS, in attempting to consummate said transaction said real estate was deeded to Celatron and certain shares of Celatron stock issued but the

Cavic Engineering Co. stock has not been issued to Celatron, Inc. and

"WHEREAS, it appears that it will not be in the interest of either corporation or their stockholders to complete said transaction,

"NOW, THEREFORE, in consideration of the mutual promises herein contained and the things done and to be done hereunder, it is therefore agreed as follows:

1. All of the stock of Celatron, Inc. issued pursuant to said agreement will be cancelled.

2. The real estate deeded to Celatron shall be conveyed to the grantors of said real estate.

3. Cavic Engineering Co. stock shall remain the property of the persons in whose names the stock is held as shown by the stock book of the company.

4. It is the intention of the parties not to complete the exchange and to place each of the corporations and their stockholders in the same position they were in at the time immediately prior to the execution of said contracts. Each party by his signature hereto, in consideration of the agreements of the other parties, hereby waives any rights that may have been created by said contracts or by the attempted consummation thereof and the cancellation thereof and each party completely releases all the other parties on account thereof."

The agreement was signed by Celatron by Jack Adams, President. It was also signed by the stockholders of Cavic Engineering Company and by Cavic Engineering Company by its president. ·

Mr. Murphy, a lawyer and stockholder of Cavic Engineering Company, stated that he was present during all of the discussions about the dissolution of the purchase by Celatron. He stated that it was the intention of all parties to release each other

and each corporation from its debts to the other.

In rebuttal the defendant called the lawyer who drafted the contract dissolving the sale. He said that he did not recall any discussions of sums owing from one corporation to the other but that the purpose of the contract was to put each corporation where they were as though the purchase contract had not occurred.

It is contended that the court erred in giving the instruction designated as Instruction 3, which is as follows:

"Your verdict must be in favor of the defendant if you believe:

First, that the parties hereto entered into a written agreement on March 20, 1962; and

Second, that such parties intended by the terms of such written agreement to release each other from all obligations incurred between the parties, including those mentioned in evidence."

The appellant asserts that the court should not have submitted the question of the intent of the parties to the jury in that the contract was clear and unambiguous and that the court should have declared as a matter of law that the agreement did not release the $7,000.00 shown as an obligation on Cavic's books when the books were turned over to Cavic's stockholders.

■■ The clause of the agreement upon which defendant relies is the fourth paragraph which states that it is the intention of the parties "to place each of the corporations and their stockholders in the same position they were in at the time immediately prior to the execution of said contract," and the concluding clause which states that each party releases all other parties on account thereof. The plaintiff-appellant states that this, when read in conjunction with the preceding paragraphs, refers only to the transfer of stock and real estate that Cavic Engineering Company turned over to Celatron, Inc. and the

Celatron stock turned over to the stockholders of Cavic. We are cited by Celatron, plaintiff-appellant, to State Mut. Life Assur. Co. of Worchester, Mass. v. Dischinger, Mo., 263 S.W.2d 394, which in construing an insurance contract states that the contract must be reviewed from end to end, the words accorded their usual meaning and that " * * * no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. * * *" This is a long accepted rule regarding the construction of contracts which we follow. However, no "substantive clause" would be "allowed to perish" if we accept the defendant's concept of its meaning. In construing a contract where there is some ambiguity and dispute as to its meaning, such a contract will be given a construction that will reflect the real intention of the parties. Robson v. United Pacific Insurance Co., Mo., 391 S.W.2d 855, and in so doing we may consider the surrounding facts and circumstances attending its execution and its interpretation by the parties. Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262.

■ The facts and circumstances at the time the agreement to set aside the contract to sell was signed were, first: that Celatron, Inc. owed Cavic $8,685.00. It was also evident that Celatron, which was keeping the books for Cavic, had entered $7,000.00 as a loan from Celatron and that money was being passed back and forth from one of the corporations to the other. The entry on the books of Cavic, even though it consisted of a valid loan, was not there at the time Celatron took Cavic over and the agreement provided that the corporations were to be placed in the "same position they were" prior to the sales contract. At that time Cavic was not indebted to Celatron for $7,000.00 but Celatron was indebted to Cavic for $8,685.00. There was evidence that both sides considered the contract as a release of all obligations of each to the other. In construing a contract, or a disputed or ambiguous phrase, the interpretation the parties placed upon it is of great weight in determining what the transaction really was. Landau v. Laughren, Mo., 357 S.W.2d 74.

■ The only evidence that might have led to a conclusion to the contrary was the testimony in rebuttal by Celatron's lawyer. He professed no knowledge of the business of the corporation and had no recollection of debts of one corporation to the other having been mentioned when he was instructed to draw the agreement. This presented an issue of fact for the jury's consideration and therefore the construction was for the jury and it was properly so instructed. Ragsdale v. Tom-Boy, Inc., Mo. App., 317 S.W.2d 679.

The appellant also contends that an instruction designated as Instruction 4 was erroneous. This instruction informed the jury that if they did not find that the defendant was released under Instruction 3 above considered but believed that the plaintiff was indebted to the defendant for engineering services, rent, etc., and that if the indebtedness of the plaintiff to the defendant equaled or exceeded plaintiff's claim their judgment should be for the defendant.

■ There seems to be no question raised as to the evidence of rent and miscellaneous charges said to be owing by Celatron to Cavic but the plaintiff does contend that the $8,685.00 owing for engineering services should not have been included. Plaintiff asserts that there was no substantial evidence that Adams was president or agent on March 1, 1961, at the time contract for engineering services was entered into. There is definite evidence that he was president of Celatron, Inc. in November of 1961. On March 1, 1961, Cavic Engineering Company dealt with Adams as president of Celatron. He said he was president and there is evidence that he was in charge of the operation of Celatron at that time. Cavic worked with him and the Celatron engineers. It turned out work for Celatron which was accepted

and used by it and Celatron paid the traveling expenses of the Cavic engineer. There is no evidence of any kind to the contrary and it is difficult to believe that the appellant is serious in its contention.

■ The managing officer of a corporation has the authority to employ the assistance necessary for the work of the corporation and upon doing so the corporation which receives the proceeds of the work is liable for it. It is true, as appellant contends, that agency cannot be proven by the mere declarations of the alleged agent but it stands proven by independent corroborative evidence. Here the evidence is strongly probative, undisputed and uncontradicted. Becker v. National Refining Co., Mo.App., 50 S.W.2d 670; State ex rel. Smith v. Bland, 353 Mo. 1073, 186 S.W.2d 443; Leggett v. Mutual Commerce Cas. Co., Mo., 250 S.W.2d 995.

■ The appellant asserts also that there was no showing that all of the contingencies and conditions of the contract for engineering services had been complied with. This assertion is predicated upon the statement of Mr. Rogers who made the contract with Cavic. He testified that Celatron was not to pay Cavic until there had been further investment made into the Celatron Corporation and that there was no proof of any such investment. In this the appellant obviously errs. The stockholders of Cavic turned over all of their stock and the Cavic corporate assets in exchange for Celatron stock. This was a large investment in Celatron capital stock, far in excess of $8,685.00, and when it was made the debt to Cavic was due and payable. Plaintiff introduced the contract of purchase showing the assets and stock transferred by Cavic to Celatron signed by Jack Adams, President of Celatron.

■ It is further contended that the instruction fails to hypothesize a required finding that the contract of March 1 for engineering services was made by an agent of Celatron and it is therefore erroneous. It is not reversible error for a court to assume the existence of an undisputed or uncontradicted fact and omit it from an instruction. White v. Citizens Insurance Company of New Jersey, Mo.App., 355 S.W.2d 421; State ex rel. Fourcade v. Shain, 342 Mo. 1190, 119 S.W.2d 788. Under the evidence here presented we find no error in the instruction materially affecting the merits of the case.

■ One other point relates to the testimony of Mr. Murphy. He was asked what took place at a meeting the parties had. Mr. Murphy testified that Adams stated that there was going to be a public sale of Celatron stock in the spring of 1962 and that this was not true. The plaintiff's objection was that "the witness should not comment on what was true or false." Here the appellant asserts that it was a voluntary statement of the witness and should have been stricken. We are cited to cases holding that voluntary statements made to prejudice the jury are properly stricken. We are confronted with the fact that no such objection was made at trial. We cannot see, nor does the plaintiff point out how the statement could possibly be prejudicial to the plaintiff. It had no relation to the facts or issues on trial and we find no merit to the point.

The judgment is affirmed.

ANDERSON, P. J., and DOUGLAS W. GREENE, Special Judge, concur.